## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| LORRAINE SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 2010-39 |
| | ) | |
| SYDNEY KATZ, | ) | |
| | ) | |
| Defendant. | ) | |

ATTORNEYS:

**Lee J. Rohn, Esq.**
Lee J. Rohn and Associates
St. Croix, VI
    *For the plaintiff,*

**Robert L. King, Esq.**
Law Offices of Robert L. King
St. Thomas, VI
    *For the defendant.*

## MEMORANDUM OPINION

**GÓMEZ, C.J.**

After a five-day trial, the jury returned a verdict in this matter in favor of the plaintiff, and against the defendant, awarding compensatory damages in the amount of $1,290,000. The defendant now moves for a new trial or, alternatively, judgment as a matter of law, or remittitur of the jury's verdict.

## I.   FACTUAL AND PROCEDURAL HISTORY

The plaintiff, Lorraine Smith ("Smith") was an employee of the Virgin Islands Bureau of Internal Revenue (the "VIBIR"). During the course of her employment, the VIBIR operated out of a

*Smith v. Katz*
Civil No. 2010-39
Memorandum Opinion
Page 2

building at 9601 Estate Thomas, St. Thomas (the "Marshall Building"). The VIBIR leased the Marshall Building from the defendant, Sydney Katz ("Katz").

While working in the Marshall Building, Smith claims that, in or around June of 2008, she began experiencing various respiratory ailments, which eventually led to asthma and an ultimate diagnosis of chronic obstructive pulmonary disorder ("COPD"). She claims that these ailments were caused by an unusually high amount of mold spores in the air inside the Marshall building. She further claims that the prevalence of these mold spores was due to the improper construction of the building, which allowed the mold to fester, and poor ventilation, which failed to remove the particulates from the building's air supply.

Smith initiated this action on June 9, 2009, in the Superior Court of the Virgin Islands. Thereafter, it was removed to this Court.

A trial before a jury in this matter commenced on June 11, 2012. On June 18, 2012, the jury returned a verdict. The jury found that Katz, as a lessor, failed to use reasonable care to protect from a harmful condition, and negligently failed to warn of this harmful condition. The jury further found that Katz's negligence was the proximate cause of Smith's injuries and concluded that he was liable to her in the amount of $1,290,000,

*Smith v. Katz*
Civil No. 2010-39
Memorandum Opinion
Page 3

comprised of $390,000 in economic losses and $900,000 in non-economic losses. The Court thereafter entered judgment on the verdict.

Katz now moves for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50, or, in the alternative, for remittitur. Smith opposes these motions.

## II.   DISCUSSION

### A.   New Trial

A motion for a new trial pursuant to Federal Rule of Civil Procedure 59 ("Rule 59") may be granted "on all or some of the issues--and to any party . . . ." Fed. R. Civ. P. 59(a). There are three principal grounds on which a motion to alter or amend judgment may be based: "(1) an intervening change in the controlling law; (2) the availability of new evidence [not available previously]; [or] (3) the need to correct a clear error [of law] to prevent manifest injustice." *N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995) (alterations in original) (quotation marks omitted).

### B.   Judgment as a Matter of Law

Pursuant to Federal Rule of Civil Procedure 50 ("Rule 50"), a party may move for judgment as a matter of law where it "has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530

*Smith v. Katz*
Civil No. 2010-39
Memorandum Opinion
Page 4

U.S. 133, 149 (2000). In evaluating whether there was adequate

evidence presented to support the jury verdict, the court must

give the non-movant, "as verdict winner, the benefit of all

logical inferences that could be drawn from the evidence

presented, resolve all conflicts in evidence in his favor, and,

in general, view the record in the light most favorable to him."

*Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir.

1991). Judgment as a matter of law under Rule 50 "should only be

granted if 'the record is critically deficient of that minimum

quantity of evidence from which a jury might reasonably afford

relief.' " *Raiczyk v. Ocean Cnty. Veterinary Hosp.*, 377 F.3d

266, 269 (3d Cir. 2004) (quoting *Powell v. J.T. Posey Co.*, 766

F.2d 131, 133-34 (3d Cir. 1985)). " 'The question is not whether

there is literally no evidence supporting the unsuccessful

party, but whether there is evidence upon which a reasonable

jury could properly have found its verdict.' " *Johnson v.*

*Campbell*, 332 F.3d 199, 204 (3d Cir. 2004) (quoting *Gomez v.*

*Allegheny Health Servs. Inc.*, 71 F.3d 1078, 1083 (3d Cir.

1995)).

C.    <u>**Remittitur**</u>

Notwithstanding the jury's award, a district court may, in

the exercise of its discretion, use its remittitur power to

reduce that award. *See Evans v. Port Auth. of N.Y. & N.J.*, 274

F.3d 346, 354 (3d Cir. 2001). In exercising that power, a court

*Smith v. Katz*
Civil No. 2010-39
Memorandum Opinion
Page 5

must "evaluate the evidence presented and determine whether or not the jury has come to a rationally based conclusion." *Spence v. Bd. of Educ.*, 806 F.2d 1198, 1201 (3d Cir. 1986); *see also Evans*, 273 F.3d at 354 ("[T]he issue to be decided here 'is not the size of the award alone, but the evidence supporting the award.' " (quoting *Blakey v. Continental Airlines, Inc.*, 992 F. Supp. 731, 737 (D.N.J. 1998))). In other words, "[a] remittitur is in order when a trial judge concludes that a jury verdict is 'clearly unsupported' by the evidence and exceeds the amount needed to make the plaintiff whole . . . ." *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1100 (3d Cir. 1995) (internal citations omitted); *see also Brunnemann v. Terra Int'l, Inc.*, 975 F.2d 175, 178 (5th Cir. 1992) (explaining that a remittitur may be granted if a jury's award is "excessive or so large as to appear contrary to right reason").

## III. ANALYSIS

### A. New Trial

Katz argues that the Court erred in permitting James A. Thibodeau ("Thibodeau") to testify as an expert, and that he is therefore at least entitled to a new trial. Thibodeau testified that various structural deficiencies in the Marshall Building caused water to seep into the building and that its poor ventilation system failed to remove that moisture. He further opined that this excess moisture in the building itself and the

*Smith v. Katz*
Civil No. 2010-39
Memorandum Opinion
Page 6

air inside of it contributed to the poor air quality complained

of by Smith.

The admissibility of expert testimony is governed by

Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other
> specialized knowledge will assist the trier
> of fact to understand the evidence or to
> determine a fact in issue, a witness
> qualified as an expert by knowledge, skill,
> experience, training, or education, may
> testify thereto in the form of an opinion or
> otherwise, if (1) the testimony is based
> upon sufficient facts or data, (2) the
> testimony is the product of reliable
> principles and methods, and (3) the witness
> has applied the principles and methods
> reliably to the facts of the case.

Fed. R. Civ. P. 702 ("Rule 702"). At its core, "Rule 702 has

three major requirements: (1) the proffered witness must be an

expert, i.e., must be qualified; (2) the expert must testify

about matters requiring scientific, technical or other

specialized knowledge; and (3) the expert's testimony must

assist the trier of fact." *Pineda v. Ford Motor Co.*, 520 F.3d

237, 244 (3d Cir. 2008) (citing *Kannankeril v. Terminix Int'l*,

128 F.3d 802 (3d Cir. 1997) (citing *In re Paoli R.R. Yard PCB

Litig.*, 35 F.3d 717, 741–42 (3d Cir. 1994))).

## 1.   Qualifications of Thibodeau

"Qualification requires that 'the witness possess some

specialized expertise.' " *Pineda*, 520 F.3d at 244 (quoting

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396,

404 (3d Cir. 2003). The Court of Appeals for the Third Circuit "ha[s] interpreted Rule 702's qualification requirement liberally." *Id.* (citing *Schneider*, 320 F.3d at 404; *Paoli*, 35 F.3d at 741). A "broad range of knowledge, skills, and training qualify an expert." *Paoli*, 35 F.3d at 741.

The Third Circuit's liberal construction of the qualification requirement "extends to the substantive as well as the formal qualifications of experts." *Id.* "[I]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996) (accepting more general qualifications in holding that a treating physician did not have to practice a particular specialty in order to testify concerning certain matters).

Yet, the Third Circuit has acknowledged that there is "a floor with respect to an expert witness's qualifications." *Elcock v. Kmart Corp.*, 233 F.3d 734, 742 (3d Cir. 2000). In *Aloe Coal Co. v. Clark Equipment Co.*, 816 F.2d 110 (3d Cir. 1987), the Third Circuit considered whether a tractor salesman was qualified to opine on the causes of a tractor's seemingly spontaneous combustion. The salesman

*Smith v. Katz*
Civil No. 2010-39
Memorandum Opinion
Page 8

> was not an engineer. He had no experience in designing construction machinery. He had no knowledge or experience in determining the cause of equipment fires. He had no training as a mechanic. He had never operated construction machinery in the course of business. He was a salesman, who at times prepared damage estimates.

*Id.* at 114. For these reasons, the Third Circuit concluded that the court below had abused its discretion by permitting the salesman to give opinion testimony as to the cause of the tractor fire. *Id.* at 115.

At trial, Thibodeau opined that the design of the building and its ventilation system caused excessive levels of moisture to accumulate in the building. He further opined that "the moisture content [of various finishings in the Marshall Building] would support microbial contamination." (Tr. of Trial, June 13, 2012, 143:11-14. [hereinafter "Trial Tr., Day 3"]. He also examined the age of various moisture stains on the building finishes, and concluded that, "based upon the amount of moisture, [the stains] can be tied right back to the life cycle of the contamination." Thibodeau concluded that the presence of this mold was the cause of the Marshall Building's poor air quality. (Trial Tr. Day 3, 26:23-27:2; 28:6-8; 30:24-31:17.)

The background upon which Thibodeau based his opinions is not ideal. Thibodeau's qualifications consist of degrees in civil and structural engineering, experience working as a civil

*Smith v. Katz*
Civil No. 2010-39
Memorandum Opinion
Page 9

engineer, and his current consulting work. Specifically, he consults on how buildings "perform with respect to water management, with respect to heating, cooling, ventilation, structural performance." (Trial Tr., Day 3, 5:7-15.) He has received training specifically in "water management." (Trial Tr., Day 3, 29:15-19.) He has also given some lectures on "[h]umidity as it relates to air quality." (Trial Tr., Day 3, 30:24.) He has also previously been qualified as an expert in at least one federal court. (Trial Tr., Day 3, 6:16-18.)[1]

Significantly, however, none of Thibodeau's qualifications bear any relationship to the growth of mold. At trial, the following colloquy occurred:

---

[1] Thibodeau's testimony in this regard was not entirely clear:

> Q.   And have you been qualified as an expert in District Courts, Federal District Courts?
>
> A.   Yes.
>
> . . . .
>
> THE COURT: Mr. Thibodeau, which Federal Courts have you testified in as an expert?
>
> THE WITNESS: Portland District Court, Ellsworth District Court. . . . .
>
> Well, certainly I can think, Ellsworth, Maine; Bangor, Maine, Portland, Maine; York District Court.

(Trial Tr., Day 3, 6:16-7:11.) The United States District Court for the District of Maine is headquartered in Portland, Maine, and has an additional courthouse in Bangor, Maine. It is not clear to what other courts Thibodeau may have been referring, or if he misunderstood the meaning of the term "Federal Courts." Nonetheless, as the Court must draw all inferences in favor of the nonmoving party, it will assume Thibodeau has been qualified as an expert in several courts at least one of which was a federal district court.

*Smith v. Katz*
Civil No. 2010-39
Memorandum Opinion
Page 10

[Thibodeau:] I'm talking about indoor air quality as it relates to moisture issues in buildings, mostly.

THE COURT: . . . . What does that mean?

THE WITNESS: Well, if your roof is leaking or your walls are leaking, so there's . . . vapor that's coming up through the slab and it elevates the humidity inside the building, it could cause an air quality problem.

. . . .

THE COURT: Your expertise in building science is something that deals with the permeability that would allow that condition to exist, correct?

THE WITNESS: Correct.

THE COURT: . . . . Your expertise is not in biochemistry, correct?

THE WITNESS: No, it's not.

THE COURT: In chemistry, correct?

THE WITNESS: No, it's not.

THE COURT: Biology, correct.

THE WITNESS: Correct.

THE COURT: Botany, correct?

THE WITNESS: Correct.

THE COURT: Zoology, correct?

THE WITNESS: Correct.

(Trial Tr., Day 3, 26:19–27:18.)

Thibodeau's qualifications also bear little relation to air quality generally. He stated only that he "served on the board of directors for the Maine Indoor Air Quality Council, with other doctors and microbiologists and folks like that." (Trial Tr. 28:3-5.) He did not elaborate on the role he played in that position. He did not describe any specific training, education, or experience he has with respect to indoor air quality.

The Court does not mean to suggest that one must be a "mold specialist" to opine on whether a building's air quality was poor. Thibodeau's primary expertise is in the field of structural engineering, a component of which is the design and construction of buildings to prevent the accumulation of excess moisture. By his own admission, he does not have any expertise is chemistry, biology, botany, or any other field that might be related to the growth of mold. He is not a doctor or a microbiologist, like other members of the Maine Indoor Air Quality Council. Thibodeau may certainly be qualified to opine on whether a building was poorly built or designed. However, his background, at best, is marginal on the question of whether the building's design or construction caused its poor air quality.

**2.   Reliability of Thibodeau's Methodology**

"Pursuant to the second prong of Rule 702, 'an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable.' " *Pineda*,

520 F.3d at 247 (quoting *Paoli*, 35 F.3d at 742 (citing *Daubert*, 509 U.S. at 589)). "While a litigant has to make more than a prima facie showing that his expert's methodology is reliable . . . '[t]he evidentiary requirement of reliability is lower than the merits standard of correctness.' " *Id.* (quoting *Paoli*, 35 F.3d at 744) (alteration original); *see also Kannankeril*, 128 F.3d at 806 ("Admissibility decisions focus on the expert's methods and reasoning; credibility decisions arise after admissibility has been determined.").

The Third Circuit has identified at least eight factors that a court should consider in assessing whether a particular methodology is reliable:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Pineda*, 502 F.3d at 247-48 (citing *Paoli*, 35 F.3d at 742 n.8.) These factors "are neither exhaustive nor applicable in every case." *Kannakeril*, 128 F.3d at 806-07. Indeed, the Third Circuit has acknowledged that, "for application to 'technical' or 'other specialized' subjects such as engineering," the *Daubert*/*Paoli*

Smith v. Katz
Civil No. 2010-39
Memorandum Opinion
Page 13

factors may be reconfigured to permit consideration of "relevant literature, evidence of industry practice, and product design and accident history." *Pineda*, 520 F.3d at 248 (citing *Milanowicz v. The Raymond Corp.*, 148 F. Supp. 2d 525, 536 (D.N.J. 2001)).

In *Young v. Burton*, 354 F. App'x 432 (D.C. Cir. 2009), the Court of Appeals for the District of Columbia considered the admissibility of expert testimony on the question of whether structural deficiencies in the plaintiffs' apartment caused their alleged "mold-illness." The Court first noted that "[t]he expert admitted he could not identify, five years later, the specific toxins to which [the plaintiffs] were exposed and he could not say which of their symptoms were caused by exposure to the damp environment of the apartment." *Id.* at 432. Moreover, the court held that "even taking a broad view of 'substance' to include 'water-damaged building' and accepting that 'mold-illness' as a real disease there is no generally accepted consensus in the scientific community that exposure to a water-damaged building causes 'mold-illness.' " *Id.* (alterations and quotation marks omitted). Accordingly, the Court of Appeals affirmed the district court's exclusion of the plaintiffs' expert.

Here, Thibodeau's core contention was that the structure of the Marshall Building

*Smith v. Katz*
Civil No. 2010-39
Memorandum Opinion
Page 14

> was performing poorly. Certainly the
> deterioration of the floor is not good.
> There was also corrosion of the acoustical
> ceiling tile grid as well.
>
> So the sheetrock was deteriorating
> because of the amount of moisture, as well
> as the tile floor, as did the ductwork.

(Trial Tr., Day 3, 103:5-10.) In support of this conclusion,

Thibodeau identified several structural defects: first, the

retaining wall built around the building to divert water "didn't

address the way the ground sloped. So the ground is still

sloping at the building. So that's . . . a structural thing

that's going to direct water at the building." (Trial Tr., Day

3, 103:20-24.) Second, he noted that "[t]here were no [water-

management] membranes on the outside of the foundation or

underneath . . . or on the slab [on which the Marshall Building

was erected.]" (Trial, Tr. Day 3, 103:25-104:17.) Third, he

found that a recently added file room in the back of the

building had been built using only concrete blocks, and that

there was "no membrance to stop the water. And block is very

porous, much more porous than concrete. So that was a defect I

found there." (Trial Tr., Day 3, 104:22-105:3.) Fourth, he found

that the building was built with virtually no insulation. (Trial

Tr., Day 3, 105:7-8.) Fifth, he noted there was no effort made

to

> remove any of the finishes that can suck up
> and hold water [and] that can
> deteriorate, . . . Sheetrock, for instance.
>
> If Sheetrock gets wet and stays wet for
> any appreciable amount of time, the only way
> to really fix it is to cut it out, remove
> it, throw it away.

(Trial Tr., Day 3, 105:17-22.)

From these observations, as noted above, he concluded that "the moisture content [of various finishings in the Marshall Building] would support microbial contamination." (Tr. of Trial, June 13, 2012, 143:11-14. [hereinafter "Trial Tr., Day 3"]. He also examined the age of various moisture stains on the building finishes, and concluded that, "based upon the amount of moisture, [the stains] can be tied right back to the life cycle of the contamination." Thibodeau concluded that the presence of this mold was the cause of the Marshall Building's poor air quality. (Trial Tr. Day 3, 26:23-27:2; 28:6-8; 30:24-31:17.)

Turning to the eight factors enumerated by the Third Circuit, the Court must first determine whether Thibodeau's testimony stems from a testable hypothesis. In the engineering context, the testability of a hypothesis is often assessed directly by examining what scientific testing the expert in fact performed to verify the hypothesis. *Milanowicz*, 148 F. Supp. at 535; *see also Saad v. Shimano Am. Corp.*, No. 98 C 1204 (SIS), 2000 WL 1036253, at *5 (N.D. Ill. July 24, 2000) (noting that,

*Smith v. Katz*
Civil No. 2010-39
Memorandum Opinion
Page 16

in a case alleging design defect in clipless bicycle pedals, the
defendant's expert measured the force necessary to achieve pedal
release in a variety of directions).

Thibodeau's core contention was that structural
deficiencies in the Marshall Building caused excessive dampness,
which in turn caused the poor air quality complained of by
Smith. To test this hypothesis, on two occasions in May of 2010,
Thibodeau measured the moisture levels in various materials in
the building, and also took readings of the humidity of the air
inside the building. Thibodeau concluded that the tests showed a
"high" or "elevated" level of moisture both in the building
materials and the air inside the building. (Trial Tr., Day 3,
41:1-2.)

This testing is fraught with difficulties. To begin,
Thibodeau identified no basis by which he determined that the
humidity in the Marshall Building was "elevated" and "high," as
he concluded. He explained simply that the humidity inside the
building was "[o]ver 60 percent." (Trial Tr., Day 3, 41:7.)
Thibodeau further found that various building finishes, such as
the sheetrock in the walls and the acoustic ceiling tiles, were
saturated with moisture. Yet, Thibodeau offered no explanation
for why a reading of sixty percent is "elevated," or elaborate
on the standards by which he determined the building finishes
were saturated. Thibodeau did not explain whether the humidity

*Smith v. Katz*
Civil No. 2010-39
Memorandum Opinion
Page 17

inside the Marshall Building was higher or lower than the ambient atmospheric relative humidity in St. Thomas, or whether it ought to be higher or lower. Indeed, Thibodeau did not even explain what normal levels of humidity and building material saturation might be for a building located in St. Thomas.

More generally, Thibodeau failed to conduct any tests that could exclude other possible causes of the Marshall Building's poor air quality. While the Court understands that Thibodeau's contention is that high levels of moisture will always lead to poor air quality, it is difficult to discern, much less appreciate, the soundness of the methodology he used to reach his conclusions. Thibodeau's conclusion is particularly suspect in light of the absence of any evidence of scientific testing comparing the air quality inside the Marshall Building with the air quality outside of it, or inside other buildings in St. Thomas or any comparable locale. "Courts have insisted time and time again that an expert may not give opinion testimony to a jury regarding specific causation if the expert has not engaged in the process of differential diagnosis--that is, the process of eliminating other possible diagnoses." *Rutigliano v. Valley Bus. Forms*, 929 F. Supp. 799, 786 (D.N.J. 1996) *aff'd without opinion*, 118 F.3d 1577 (3d Cir. 1997); *see also Oddi v. Ford Motor Co.*, 234 F.3d 136, 157 (3d Cir. 2000) (discussing failure of expert to consider alternative causation).

*Smith v. Katz*
Civil No. 2010-39
Memorandum Opinion
Page 18

Several courts have suggested that, in order to ensure reliability, experts opining on causation in toxic tort cases must at a minimum apply the three-step methodology approved by the World Health Organization:

> 1) evaluating the chemicals to which the individual may have been exposed and the concentrations of those chemicals in the air the individual breathed; 2) evaluating the level of exposure necessary to produce adverse health effects, according to published scientific literature; and 3) combining the first two evaluations to estimate the likelihood that the individual actually suffered any of the harmful effects of the chemical in question.

*Young v. Burton*, 567 F. Supp. 2d 121, 129 (D.D.C. 2008) (citing *Cavallo v. Star Enter.*, 892 F. Supp. 756, 764 (E.D. Va. 1995)).

The next factor--peer review--does not have a precise analogue in the engineering context. However, courts have looked to "whether an expert has supported his conclusions through discussion of the relevant literature," as well as "industry practice." *Milanowicz*, 148 F. Supp. 2d at 533. These considerations also bear on the fifth factor--whether the method is generally accepted. Here, Thibodeau did not identify any relevant literature or industry practices bearing on his opinion at the trial. Although he opined at length regarding how buildings ought to be constructed, he pointed to no accepted practices regarding the construction of buildings to prevent excess accumulation of water, or to any literature on this

Smith v. Katz
Civil No. 2010-39
Memorandum Opinion
Page 19

issue. Indeed, the basis for his opinions on how buildings ought to be constructed to properly manage moisture levels is at this point entirely unclear.

In the engineering context, the fourth factor is often evaluated by looking to standards promulgated by federal agencies or independent standards organizations. *See Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 537 (7th Cir. 2000) (finding that expert's failure to submit alternative design theories to American National Standards Institute was factor supporting exclusion of his testimony); *Stanczyk v. Black & Decker, Inc.*, 836 F. Supp. 565, 567 (N.D. Ill. 1993) (finding that miter saw guard's compliance with Underwriter Laboratories' standards helped undermine expert testimony alleging design defect).

Here, Thibodeau referenced "standards" regulating the moisture content of various building finishes, such as sheetrock, although he did not elaborate on the source of these standards. (Trial, Day 3, Tr. 101:9-18.) He did not identify any standards pertaining to the construction of buildings to manage moisture, either with respect to preventing moisture from penetrating the building, or removing moisture already present in the building. Indeed, there is no suggestion in his testimony that the design or construction of the Marshall Building was not in conformity with all relevant industry standards.

*Smith v. Katz*
Civil No. 2010-39
Memorandum Opinion
Page 20

Turning to the seventh factor, Thibodeau's qualifications with respect to his purported methodology are unclear, at best. As discussed above, Thibodeau presented little evidence of his expertise in any field related to air quality. He did not state whether or not he had performed the moisture tests he employed in the Marshall Building ever before. He did not explain what training or experience enabled him to interpret the raw data he observed to reach his conclusions that the moisture levels inside the Marshall building were excessively high.

The eighth factor addresses whether the methodology is used in non-judicial purposes. Thibodeau did not offer any testimony in this regard. However, it is conceivable that testing moisture levels in buildings serves non-judicial purposes, such as determining whether certain finishes need to be replaced, locating areas where water is penetrating the building, or assessing the efficiency of the ventilation system.

In sum, Thibodeau's testimony gives the Court some pause, particularly given the concerns about his limited expertise in the air quality field and the potential for an inaccurate assessment. At the same time, the Court is well aware that the Third Circuit "ha[s] interpreted Rule 702's qualification requirement liberally." *Pineda*, 520 F.3d at 244. An admissibility determination is not dependent on whether the best or most qualified expert is proffered. While the expert must

*Smith v. Katz*
Civil No. 2010-39
Memorandum Opinion
Page 21

"possess some specialized expertise," *Schneider*, 320 F.3d at 404, it is not required that the expert "have the specialization that the court considers most appropriate." *Holbrook*, 80 F.3d at 782. Thus, Thibodeau's specialization, though limited, is not preclusive to his testimony. The potential imprecision of his assessment methodology is also not preclusive to his testimony. Indeed, The Court is also well aware that correctness is not the standard by which a Court is to assess an expert. *Id*. at 237 ("The evidentiary requirement of reliability is lower than the merits standard of correctness.") Accordingly, the Court finds that the admission of Thibodeau's testimony does not warrant the grant of a new trial.

**B.**   **Judgment as a Matter of Law**

Although the Court has held that Thibodeau's testimony should have been excluded, and therefore, at a minimum, a new trial is warranted, its inquiry cannot end there. The Court must further determine whether Katz is entitled to judgment as a matter of law.

Smith presented two claims to the jury in this matter. First, she asserted that Katz, as lessor, negligently failed to protect from a harmful condition. Second, she asserted that Katz, as lessor, negligently failed to warn of a harmful condition.

Smith v. Katz
Civil No. 2010-39
Memorandum Opinion
Page 22

In the Virgin Islands, to prevail against a lessor on a claim of negligently failing to protect from a harmful condition, the plaintiff must show: (1) that the lessor leased the premises for a purpose involving the admission of the public; (2) that the plaintiff entered the premises for that purpose; (3) when the lessee took possession, there was a condition on the premises that involved an unreasonable risk of harm to members of the public; (4) that the lessor knew or in the exercise of reasonable diligence should have known of this condition and the unreasonable risk involved; (5) that the lessor has reason to expect the lessee will admit the public before the land is put in a safe condition; (6) that the lessor fails to exercise reasonable care to discover or remedy the condition, or protect the public against it; (7) that this condition was the cause of the plaintiff's injuries; and (8) that the plaintiff suffered damages. *See* RESTATEMENT (THIRD) OF TORTS: LIAB. FOR PHYSICAL & EMOTIONAL HARM § 53(d) (outlining requirements for lessor liability).[2]

_____

[2] In the Virgin Islands, "[t]he rules of the common law, as expressed in the restatements of the law . . . shall be the rules of decision in the courts of the Virgin Islands . . . in the absence of local laws to the contrary." V.I. CODE ANN., tit. 1, § 4. The Virgin Islands Supreme Court has interpreted this provision to required Virgin Islands courts to apply the most recently adopted version of the Restatement at the time of consideration, unless and until the Supreme Court decides to depart from that portion of the relevant Restatement. *See Banks v. Int'l Rental & Leasing Corp.*, 55 V.I. 967, 978 (S. Ct. 2011) (noting that, in the ordinary course, Virgin Islands Courts must "mechanically apply the most recent Restatement");

Smith v. Katz
Civil No. 2010-39
Memorandum Opinion
Page 23

Similarly, to prevail against a lessor for negligently failing to warn of a dangerous condition, a plaintiff must show: (1) that there was a condition on the premises that involved an unreasonable risk of harm to persons on the premises; (2) that the plaintiff was someone on the premises with the consent of the lessee; (3) that the lessor knew or had reason to know of this condition and realized or should have realized the risk involved; (4) that the lessor concealed or failed to conceal the risk involved; (5) that the lessee did not know or have any reason to know of the condition or risk involved; (6) that lessor had reason to expect that the lessee would not discover the condition or realize the risk; (7) that the condition was a proximate cause of some injury to the plaintiff; and (8) that the plaintiff suffered damages. *See* RESTATEMENT (THIRD) OF TORTS: LIAB. FOR PHYSICAL & EMOTIONAL HARM, § 53(C) (outlining requirements for liability of lessor).

During the course of the trial, Smith testified. She stated that shortly after beginning to work in the Marshall Building, she began experiencing a number of health problems. Specifically, she stated that she began suffering from headaches, having dizzy bouts, skin irritation, swollen tonsils, and "terrible" difficulty breathing. (Tr. of Trial, June 11,

---

*Matthew v. Herman*, 56 V.I. 674, 679 n.3 (S. Ct. 2012) (noting that a proposed new version of a Restatement does not apply until it is published).

Smith v. Katz
Civil No. 2010-39
Memorandum Opinion
Page 24

2012, 48:2-49:9. [hereinafter "Trial Tr., Day 1"].) She began
seeking treatment for these conditions, and received
prescriptions for various asthma and anti-inflammatory
medications.

In June of 2008, Smith testified to a "very strong stench"
in the building. (Trial Tr., Day 1, 50:22.) After only a short
while in the Marshall Building, she felt her eyes burning and
began coughing uncontrollably. She vomited and felt disabling
nausea. She then went to the emergency room at a nearby
hospital, where she was treated for asthma. (Trial Tr., Day 1,
50:22-52:9.)

One of Smith's treating physicians, Stephen Grundfast, M.D.
("Grundfast"), offered expert testimony on the illness that
Smith suffered. He opined that Smith suffered from asthma, which
ultimately developed into COPD. However, Grundfast was, by his
own admission, "not a mold expert by any means." (Trial Tr., Day
1, 393:9) While he identified mold as one possible cause of
asthma, he also noted that "any irritant can cause asthma."
(Trial Tr., Day 1, 395:6-7.)

Howard M. Weiner, M.D. ("Weiner"), also offered expert
testimony as to the possible effects of mold exposure. He stated
that, in June of 2008, air quality samplings of the air inside
the Marshall Building showed "very high" amounts of mold spores
in the air, "up to 47,000 spores per cubic meter, which is a

great deal since in your home you would expect about 300 to
500." (Tr. of Trial, June 12, 2012, 187:18-20 [hereinafter
"Trial Tr., Day 2"].) He further opined that, for mold spore
levels to be that high, there must have been "a chronic source
of moisture intrusion into the building that allowed for the
mold to grow as much as it did." (Trial Tr., Day 2, 188:9-11.)

Weiner further testified that, "in a damp environment or a
moldy environment, you will have aggravation of your respiratory
tract, so that your nose can get itchy, runny stuffy, sneezy."
(Trial Tr., Day 2, 190:16-19.) He also explained that even those
who do not normally experience allergies can develop allergy
like symptoms, such as itchy and teary eyes, sinus congestion,
postnasal drip, and swollen glands. (Trial Tr., Day 2, 190:16-
25.) Individuals already suffering from asthma could be expected
to see their symptoms worsen. (Trial Tr., Day 2, 191:13-14.)

Here, the evidence adduced at trial tended to show that (1)
Smith suffered from COPD, resulting from her chronic asthma; (2)
that Smith's symptoms worsened during the period of time in
which she worked in the Marshall Building; (3) that, on at least
one occasion while Smith was working in the Marshall Building,
the air inside the building had a very high level of mold
spores; and (4) high levels of mold spores may exacerbate
asthma.

*Smith v. Katz*
Civil No. 2010-39
Memorandum Opinion
Page 26

In sum, then, the evidence shows a not-insignificant correlation between Smith's injuries and her exposure to the air in the Marshall Building. Viewing the evidence in the light most favorable to Smith, it also can be said that there was an "evaluat[ion of] the chemicals" to which Smith was exposed, and an "evaulat[ion of] the level of exposure necessary to produce adverse health effects," the first two prongs of the widely-accepted World Health Organization's method for evaluating toxic exposure. *Young*, 567 F. Supp. 2d at 128 (D.D.C. 2008) (citing *Cavallo v. Star Enter.*, 892 F. Supp. 756, 764 (E.D. Va. 1995)).

What is absent, however, is any expert testimony combining the correlation between Smiths' injuries and her exposure, the level of mold to which she was exposed, and the level of mold exposure necessary to produce adverse health effects to show "the likelihood that [Smith] actually suffered any of the harmful effects of the [mold] in question." *Young*, 567 F. Supp. 2d at 128.

"An actor's liability is limited to those harms that result from the risks that made the actor's conduct tortious." RESTATEMENT (THIRD) OF TORTS, § 29 (2010). This limitation on liability, commonly referred to as "proximate causation," requires that, to establish liability, the plaintiff must show that "the harms risked by [the] tortious conduct [of the defendant] include the general sort of harm suffered by the plaintiff." *Id.* at cmt. d.

Smith v. Katz
Civil No. 2010-39
Memorandum Opinion
Page 27

> When defendants move for a determination
> that the plaintiff's harm is beyond the
> scope of liability as a matter of law,
> courts must initially consider all the range
> of harms risked by the defendant's conduct
> that the jury *could* find as the basis for
> determining that conduct tortious. Then, the
> court can compare the plaintiff's harm with
> the range of harms risked by the defendant
> to determine whether a reasonable jury might
> find the former among the latter.

*Id.*

Courts throughout the country have varied widely with respect to the level of certainty they required with respect to the issue of causation in toxic tort cases generally, and in mold cases specifically. *See generally* Jeffrey J. Hayward, *The Same Mold Story?: What Toxic Mold is Teaching Us about Causation in Toxic Tort Litigation*, 83 N.C. L. REV. 518, 536-38 (2005) (collecting cases).

The overall consensus appears to be that, at a minimum, to prevail in a toxic tort case, a plaintiff must adduce proof of both "general" causation and "specific" or "individual" causation. "General causation has typically been understood to mean the capacity of a toxic agent . . . to cause the illness complained of by plaintiffs. If such capacity is established, 'individual causation' answers whether that toxic agent actually caused a particular plaintiff's illness." *In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1129 (9th Cir. 2002); *see also Jack v. Glaxo Wellcome, Inc.*, 239 F. Supp. 2d 1308, 1320-21

*Smith v. Katz*
Civil No. 2010-39
Memorandum Opinion
Page 28

(N.D. Ga. 2002) ("General causation is the capacity of a product

to cause injury; specific causation is proof that the product in

question caused the injury of which the plaintiff complains");

*Goebel v. Denver & Rio Grande W. Ry. Co.*, 346 F.3d 987, 990

(10th Cir. 2003) (identifying "two separate aspects of

causation . . . in this case: (1) general causation, meaning

that the particular circumstances . . . *could* have caused [the

plaintiff]'s injury, and (2) specific causation, meaning that

those circumstances *did in fact* cause [the plaintiff]'s injury."

(emphasis original)).

As noted above, there is ample evidence in this case that

mold can worsen asthma. Weiner also opined that the mold spores

present in the air in the Marshall Building was of the asthma-

exacerbating variety. The Court's inquiry will thus focus on

whether there is sufficient evidence of specific causation.

Courts have been especially skeptical of attempts to show

causation from a temporal relationship alone. *See, e.g.*, *Moore

v. Ashland Chem.*, 151 F.3d 269, 278 (5th Cir. 1998) ("In the

absence of an established scientific connection between exposure

and illness, . . . the temporal connection between exposure to

chemicals and an onset of symptoms, standing alone, is entitled

to little weight in determining causation."); *Young*, 576 F.

Supp. 2d at 128 ("While the circumstances of the exposure and

the timing of the illness may be so compelling as to render

*Smith v. Katz*
Civil No. 2010-39
Memorandum Opinion
Page 29

further evidence of causation unnecessary, temporal association between exposure and illness, without more, is generally insufficient to establish causation."); *Roche v. Lincoln Prop. Co.*, 278 F. Supp. 2d 744, 764 (E.D. Va. 2003) (excluding an expert opinion in a mold case "based primarily, if not solely, on temporal proximity").

The "most widely-used" method of demonstrating causation in toxic tort cases "is to present scientifically-accepted information about the dose-response curve for the toxin which confirms that the toxin can cause the health effects experienced by the plaintiff at the dosage the plaintiff was exposed to." *Young*, 576 F. Supp. 2d at 128; *see also Bonner v. ISP Techs. Inc.*, 259 F.3d 924, 928 (8th Cir. 2001) ("To prove causation in a toxic tort case, a plaintiff must show both that the alleged toxin is capable of causing injuries like that suffered by the plaintiff in human beings subjected to the same level of exposure as the plaintiff, and that the toxin was the cause of the plaintiff's injury"); *In re Breast Implant Litig.*. Indeed, courts have held that "[s]cientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiff's burden in a toxic tort case." *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 781 (10th Cir. 1999) (quoting *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105,

*Smith v. Katz*
Civil No. 2010-39
Memorandum Opinion
Page 30

1106 (8th Cir. 1996)); *see also Moore*, 151 F.3d at 278 (finding expert testimony unreliable because expert had no information about the level of plaintiff's exposure to the chemical solution and thus could not adequately support an assertion that the levels plaintiff was exposed to were sufficient to cause adverse health effects).

Further complicating causation in mold cases is the question of whether the plaintiff has a proven sensitivity or allergy to the molds to which she or he was exposed. *See, e.g.*, *Roche*, 278 F. Supp. 2d at 751 (finding an expert's opinion that mold was the cause of an illness unreliable because the plaintiff was not allergic to the molds found in his apartment); *Flores v. Allstate Tex. Lloyd's Co.*, 229 F. Supp. 2d 697, 702 (S.D. Tex. 2002) (noting absence of reliable proof of causation where medical expert had not based "his testimony on the results of any testing done to determine whether Plaintiffs [were] allergic to any specific type of mold found in their home").

In *Young v. Burton*, after affirming the district court's decision to exclude the plaintiffs' toxicological expert, the Court of Appeals for the District of Columbia Circuit considered whether summary judgment against the plaintiffs was appropriate. The district court had found that the medical experts could conclude only that exposure to mold was one possible cause of the plaintiffs' injuries. The court of appeals thus found that

*Smith v. Katz*
Civil No. 2010-39
Memorandum Opinion
Page 31

the statements of the plaintiffs' medical experts "could not be stretched to satisfy [the plaintiffs'] burden of proof as to causation." *Young*, 354 F. App'x at 433. What remained, then, was the plaintiffs' own testimony that they began experiencing their symptoms shortly after being exposed to the allegedly toxic environment. The court of appeals found this evidence likewise insufficient: "the link between a potentially toxic building environment and symptoms experienced by tenants is beyond the ken of laypersons. Jurors would have no rational basis for evaluating whether the mold caused any medical conditions." *Id.* Accordingly, the court of appeals affirmed the district court's grant of summary judgment against the plaintiffs.

However, in the Virgin Islands, the Third Restatement of Torts governs negligence claims. It is not clear the extent to which the Third Restatement mandates as strict an approach to causation as the cases recited above. Indeed, the Third Restatement recognizes the doctrine of res ipsa loquitor for all negligence claims. This doctrine provides that "The factfinder may infer that the defendant has been negligent when the accident causing the plaintiff's harm is a type of accident that ordinarily happens as a result of the negligence of a class of actors of which the defendant is the relevant member." RESTATEMENT (THIRD) OF TORTS: LIAB. FOR PHYSICAL & EMOTIONAL HARM § 17 (2010). In essence, res ipsa loquitur allows a plaintiff to prove a

*Smith v. Katz*
Civil No. 2010-39
Memorandum Opinion
Page 32

defendant's negligence through circumstantial evidence. *See id.*
at cmt. a.

However, "res ipsa loquitur is circumstantial evidence of a
quite distinctive form." *Id.* at cmt. b. The doctrine's operation
is cabined to those situations in which "the court does not
know, and cannot find out, what actually happened in the
individual case. Instead, the finding of likely negligence is
derived from knowledge of the causes of the type or category of
accidents involved." *Id.*

The Third Restatement acknowledges that "In many
situations, neither common knowledge nor expert testimony may be
available to support the idea that the type of accident
ordinarily happens because of the negligence of the defendant."
*Id.* at cmt. d. In such instances, "res ipsa loquitur can be
found applicable only if the plaintiff has offered evidence
tending to negate the presence of causes other than the
defendant's negligence." *Id.; see also Fedorczyk v. Caribbean
Cruise Lines, Ltd.*, 82 F.3d 69, 74 ("The doctrine [of res ipsa
loquitur is applicable when: (1) the occurrence itself
ordinarily bespeaks negligence; (2) the instrumentality was
within the defendant's exclusive control; and (3) there is no
indication that the injury was the result of the plaintiff's own
voluntary act or neglect") (applying New Jersey law); *Collins v.
N-Ren Corp.*, 604 F. 2d 659, 661 ("Res ipsa loquitur cannot be

invoked until, as a preliminary proposition, a plaintiff

establishes what caused the accident.") (applying Oklahoma law);

*Depositors Ins. Co. v. Wal-Mart Stores, Inc.*, 506 F.3d 1092,

1096 (8th Cir. 2007) (holding that, for res ipsa loquitur to

apply, "the injury must either be traced to a specific

instrumentality or cause for which the defendant was

responsible, or it must be shown that the [defendant] was

responsible for all reasonably probable causes to which the

accident could be attributed.") Thus, for example, "if a product

malfunctions six months after being acquired by the purchaser,

an inference of the negligence of the manufacturer . . . becomes

permissible only if the consumer introduces evidence tending to

show that nothing during the six-month period of use explains

why the product malfunctioned." RESTATEMENT (THIRD) OF TORTS: LIAB. FOR

PHYSICAL & EMOTIONAL HARM § 17 at cmt. d (2010).

Significantly, however, the Restatement acknowledges that,

in certain circumstances, correlation when combined with a

jury's general knowledge can suffice to negate other causes. The

Restatement provides the following illustration:

> Bruce parks his car at the top of a
> driveway, which is on an incline. Two
> minutes later, the car rolls down the
> incline and injures Janice . . . . In suing
> Bruce, Janice seeks to rely on res ipsa
> loquitur in order to prove Bruce's
> negligence. Admittedly, mechanical failure
> or third-party tampering are at least
> possible explanations for why the car

Smith v. Katz
Civil No. 2010-39
Memorandum Opinion
Page 34

> rolled. Still the jury's general knowledge
> can affirm that driver negligence is the
> usual cause when cars roll so quickly after
> being parked.

RESTATEMENT (THIRD) OF TORTS: LIAB. FOR PHYSICAL & EMOTIONAL HARM § 17,

illus. 2 (2010).

Here, the testimony adduced at trial showed a high level of

mold spores in the Marshall building. The testimony further

showed that the presence of these spores could cause the type of

injuries Smith now complains of. Smith herself testified to the

"very strong stench" in the building on one occasion that led to

her coughing uncontrollably and vomiting.

The facts in this case thus bear some similarity to those

in *Gass v. Marriott Hotel Services, Inc.*, 558 F.3d 419 (6th Cir.

2009). In that case, the plaintiffs testified that the defendant

negligently sprayed pesticides in their hotel room while it was

still in use. The plaintiffs stated that the concentration of

pesticides was such that "a thick, horrid, acrid, putrid cloud

of toxic chemicals filled the room." *Id.* at 430. Given this

testimony, the Court of Appeals for the Sixth Circuit held that

"Expert testimony is not necessary to allow a reasonable jury to

conclude that such actions are negligent, inasmuch as an

ordinary person understands that it is unacceptable to enter a

place where another is residing and fill that place with

airborne poison . . . ." *Id.*

Smith v. Katz
Civil No. 2010-39
Memorandum Opinion
Page 35

The ultimate question, then, is whether the facts in this case are sufficiently similar to those in *Gass* or the Restatement's parked-car example as to permit an inference of specific causation from correlation alone. Smith did testify to feeling immediate effects, on at least one occasion, from the air inside the building. Smith also testified to a substantial worsening of her condition during her time working there. Significantly, Smith did not claim that her exposure to the air inside the Marshall Building was the root cause of her asthma; merely that it exacerbated her condition. By her own evidence, asthma may have many underlying causes. At the same time, she did put forward evidence that the level of mold spores in the Marshall Building would tend to exacerbate asthma in those who already suffered from the condition.

Thus, unlike many of the mold cases discussed above, the jury in this case was not presented with a claim of "mold illness" or that the plaintiff suffered from some disease specifically caused by mold. The question is thus simply whether a jury could have reasonably inferred that an asthmatic's condition might be worsened by being regularly exposed to air with a concentration of mold spores nearly 100 times greater than normal. Although she was not literally breathing air filled with poison, as in *Gass*, Smith testified that, on at least one occasion, the air had an immediate, debilitating effect. Expert

*Smith v. Katz*
Civil No. 2010-39
Memorandum Opinion
Page 36

testimony is ultimately not required to show that such air may cause injury, particularly for a person already suffering from asthma. Moreover, this evidence is also sufficient for the jury to infer that Smith had a sensitivity to the mold in the Marshall Building. Given her testimony, there can be no serious dispute that Smith was not "allergic" or did not suffer any reaction to the mold in the building.

Applying the res ipsa loquitur doctrine, the jury may have permissibly inferred that Smith's injury "ordinarily happens as a result of the negligence of a class of actors of which the defendant is the relevant member." RESTATEMENT (THIRD) OF TORTS: LIAB. FOR PHYSICAL & EMOTIONAL HARM § 17 (2010). Smith's claim is a limited one--she asserts that her asthma became substantially worse. Her claim is supported by evidence showing an extraordinarily high degree of mold spores in the Marshall Building and her own testimony about the immediate effect this had on her. The Court thus cannot say that the jury's verdict was unreasonable.

## C.   <u>Remittitur</u>

Katz also seeks remittitur of the jury's award, consisting of damages in the amount of $390,000 for economic losses and $900,000 for non-economic losses.

" '[A] district court should be alert to its responsibility to see that jury awards do not extend beyond all reasonable bounds.' " *Gumbs v. Pueblo Int'l, Inc.*, 823 F.2d 768, 772 (3d

Cir. 1987) (quoting *Walters v. Mintec/Int'l*, 758 F.2d 73 (3d
Cir. 1985)). For example, in *Williams v. Martin Marietta
Alumina, Inc*., 817 F.2d 1030 (3d Cir. 1987), the plaintiff fell
while working on the roof of a building on the defendant's
property. As a result, he injured his back. He sustained no
permanent injuries, and after brief rehabilitation, his reflexes
returned to normal, he had no nerve damage, and he returned to
normal strength. Nonetheless, the jury awarded him $317,000 for
pain and suffering.

On appeal, the Third Circuit held that "the award of the
jury of more than $300,000 for pain and suffering was
excessive." *Id*. at 1040 In reaching this conclusion, the Third
Circuit compared recent cases involving similar back injuries,
and noted that awards ranged from $85,000 to $150,000.
Significantly, it found no court had approved an award of
$300,000 or more for injuries similar to what the plaintiff had
suffered. The Court thus remanded the case to the district
court, and instructed it that "An award in excess of $100,000
for [the plaintiff's] pain and suffering extends beyond
reasonable grounds." *Id*. at 1041.

Similarly, in *Gumbs v. Pueblo Int'l*, 823 F.2d 768 (3d Cir.
1987), the plaintiff slipped and fell in a grocery store. As a
result, she sprained her coccyx, causing her abdominal and
vaginal pain, and back spasms. Her pain would likely be

*Smith v. Katz*
Civil No. 2010-39
Memorandum Opinion
Page 38

permanent, and required her to take regular medication. After a trial, the jury awarded her $900,000 for pain and suffering. The district court thereafter remitted her damages to $575,000.

The Third Circuit reversed. It explained that:

> The plaintiff obviously led a busy business and family life. She not only enjoyed an accounting practice but operated a secretarial school, maintained a home for her husband, five children, and one stepchild. She looked after a sick mother. She also testified that prior to the fall, she engaged in jogging, swimming, tumbling, and tennis with her children. She stated that these activities suffered as a result of her pain. Furthermore, the pain interfered with her sexual relationship with her husband, resulting in his drinking to excess and their ultimate separation. On the other hand, at the time of the accident [the plaintiff] had preexisting scoliosis, an osteoarthritic condition of the spine, and weighed about 240 pounds which even she considered 'very heavy' but not a problem.

*Id.* at 774-75. In light of its careful review of the record, the Third Circuit ultimately concluded that the maximum recovery a jury could have awarded the plaintiff was $235,000. *Id.* at 775.

**1.   Economic Damages**

In evaluating jury awards for economic damages, courts look to the concrete, economic harms suffered by the plaintiff, such as lost wages or medical expenses. *See, e.g.*, *Taylor v. Otter Tail Corp.*, 484 F.3d 1016, 1019 (8th Cir. 2007) (medical expenses); *Conde v. Starlight I, Inc.*, 103 F.3d 210, 215 (1st Cir. 1997) (past and future lost earnings).

*Smith v. Katz*
Civil No. 2010-39
Memorandum Opinion
Page 39

Here, the evidence of economic losses consisted primarily of the testimony of Wanda Morris, director of the Virgin Islands Workmen's Compensation Administration. She testified that Smith had incurred medical expenses in the amount of $24,381.08, and lost wages in the amount of $4,792.31.[3] Smith testified that she additionally incurred several thousand dollars in travel expenses to seek treatment from doctors outside of the Virgin Islands. Lastly, Grundfast opined generally that Smith may continue to need follow-up care and medication for her asthma.

There was no evidence about any future lost earnings. Significantly, the record evidence indicates that Smith's employment is current.

The Court thus finds that the jury's award of $390,000 for economic losses is " 'clearly unsupported' by the evidence and exceeds the amount needed to make the plaintiff whole," *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1100 (3d Cir. 1995). Rather, the Court finds that an award of $50,000 for economic losses is in keeping with the evidence.

_____

[3] Although the Virgin Islands Workmen's Compensation Administration reimbursed Smith for these expenses, when she initiated judicial proceedings, it obtained a lien against these reimbursements, pursuant to Title 24, Section 263 of the Virgin Islands Code. Smith will thus be obliged to return these reimbursement payments.

*Smith v. Katz*
Civil No. 2010-39
Memorandum Opinion
Page 40

### 2.    Non-Economic Damages

"A mainstay of the excessiveness determination is comparison to awards for similar injuries." *Salinas v. O'Neill*, 286 F.3d 827, 830 (5th Cir. 2002). Damage awards based on intangible harm are to be reviewed "with deference . . . because the harm is subjective and evaluating it depends considerably on the demeanor of witnesses." *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 487-88 (5th Cir. 2001).

The jury's verdict in this case is largely in accord with verdicts awarding damages for serious respiratory illnesses that were wholly caused by the defendant's conduct. *See, e.g.*, *In re Jt. E. & S. Dist. Asbestos Litig.*, 827 F. Supp. 1014, 1059 (remitting pain-and-suffering damages to $1.3 million for asbestos-induced mesothelioma); *Battaglia v. Conrail*, No. L-08-1332, 2009 WL 3325903, at *13 (Ohio Ct. App. Oct. 16, 2009) (affirming award of $2.6 million where evidence showed that twenty-year exposure to diesel exhaust from defendants' trains "caused and exacerbated [Plaintiff's] asthma, and that his condition would eventually worsen, almost certainly reducing his lifespan"); *French v. Philip Morris Inc.*, Case No. 00-01706 CA 22 (FGS) 2002 WL 32153635, at *7 (Fla. Cir. Ct. Sept. 1, 2002) (remitting damages to $500,000 where flight attendant claimed to have developed chronic sinusitis after being exposed to second hand smoke on airplanes); *Stroot v. New Haverford P'ship*, 793

Smith v. Katz
Civil No. 2010-39
Memorandum Opinion
Page 41

A.2d 411, 417-18 (Del. Super. Ct. 1999) (affirming jury verdict
in the amount of $1 million for mold exposure that permanently
worsened asthma, caused tuberculosis, and impaired cognitive
functioning).

By contrast, jury awards for the aggravation of pre-
existing respiratory conditions are generally an order of
magnitude lower than the award in this case. For example, in
*Tolson v. Marriott Int'l*, 9 F. App'x 121, 125 (4th Cir. 2001),
the Court of Appeals for the Fourth Circuit affirmed a jury
award of $120,000 for a plaintiff whose chronic rhinitis was
exacerbated by exposure to ozone, leading to post-nasal drip
that permanently thickened the plaintiff's vocal cords.

In *Guess v. Pfizer, Inc.*, 971 F. Supp. 164 (E.D. Pa. 1996),
the plaintiff sued on the grounds that various chemicals in the
laboratory he worked in exacerbated his asthma. The jury awarded
$11,250 in non-economic damages. *Id.* at 167. Similarly, in
*Labbett v. Port Auth.*, 714 A.2d 522 (Pa. Commw. Ct. 1998), the
Court affirmed the jury's award of $12,000 for asthma that was
exacerbated by smoke inhalation when one of the defendant's
buses caught fire. *Id.* at 526. *See also Cohen v. Fox Mgmt.*, No.
1010-14539, 2011 WL 8625644 (Or. Cir. Ct. Dec. 7, 2011) (award
of $140,000 to plaintiff for pain and suffering resulting from
exacerbation of allergies caused by mold in the plaintiff's
home); *Chong v. Hansford*, No. PAS-L-1776-08 (GSR), 2010 WL

Smith v. Katz
Civil No. 2010-39
Memorandum Opinion
Page 42

5781023 (N.J. Super. Ct. Oct. 14, 2010) (award of $20,000 to
plaintiff who suffered exacerbation of asthma as a result of
smoke inhalation); *Spence v. Hickory Lakes, L.P.*, 08-A-9734-1
(MHC), 2010 WL 5859091 (Ga. State Ct. Dec. 1, 2010) (award of
$16,000 to tenants who suffered from respiratory problems and
allergies as a result of mold in an apartment); *Kesti v. Lau*,
No. CGC10496844, 2010 WL 6649010 (Cal. Super. Ct. Dec. 15, 2010)
(award of $100,000 for respiratory problems caused by mold in
apartment); *Goldstein v. Brookwood Bldg. Corp.*, No. 6649/07,
2010 WL 3028702 (N.Y. Super. Ct. June 13, 2010) (award of
approximately $90,000 for pain and suffering resulting from
allergy symptoms caused by mold in the two plaintiffs' home).

In the present case, the undisputed evidence shows that
Smith suffered from asthma and COPD before she worked in the
Marshall Building. Unlike *Gumbs*, the record is devoid of
evidence of how the worsening of her asthma may have affected
her general life activities, aside from its immediate symptoms.
Moreover, by her own admission, she was a regular, two-pack-a-
day smoker for fifteen years. Although, as noted above, there is
evidence that her condition worsened substantially, there is no
evidence to suggest that she developed a new, permanent
condition or illness as a result of her exposure to the air in
the Marshall Building. Her claim is thus most analogous to those
presented in *Tolson* or *Guess*, where the preexisting conditions

of the plaintiffs were exacerbated by their exposure to toxic substances.

Yet, the amount of the jury's award for non-economic losses is more comparable to those awarded to individuals who acquired a new, life-altering illness as a result of their toxic exposure. These are not the facts of this case. Indeed, the amount of the award is so many times greater than awards in cases with similar facts that it "appear[s] contrary to right reason . . . ." *Brunnemann v. Terra Int'l, Inc.*, 975 F.2d at 178. This is not the case of a healthy individual made seriously ill, but rather an already seriously ill individual made even more unhealthy. Moreover, a comparison of cases involving similar injuries, as the Third Circuit did in *Williams*, indicates that the damages awarded for similar respiratory injury range from $11,000 to $140,000. The Court has found no other court that has approved an award of $900,000 for non-economic damages for similar injuries. The Court thus finds that the $900,000 award for non-economic losses is " 'clearly unsupported' by the evidence and exceeds the amount needed to make the plaintiff whole . . . ." *Starceski*, 54 F.3d at 1100. Accordingly, the Court will remit the award of non-economic damages. The Court finds that an award of $100,000 for non-economic losses is in keeping with the evidence and applicable law.

*Smith v. Katz*
Civil No. 2010-39
Memorandum Opinion
Page 44

An appropriate order follows.

S_____
         **Curtis V. Gómez**
          **Chief Judge**